UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA                    #28

**CIVIL MINUTES - GENERAL**

| Case No. | ED CV 14-121 PSG (SPx) | Date | January 6, 2015 |
|---|---|---|---|
| Title | CV Ice Company, Inc. v. Golden Eagle Insurance Company, *et al.* | | |

| Present: The Honorable | Philip S. Gutierrez, United States District Judge | |
|---|---|---|
| Wendy Hernandez | | Not Reported |
| Deputy Clerk | | Court Reporter |
| Attorneys Present for Plaintiff(s): | | Attorneys Present for Defendant(s): |
| Not Present | | Not Present |

**Proceedings (In Chambers):**    Order GRANTING IN PART and DENYING IN PART Defendant's Motion for Summary Judgment

Before the Court is Defendant Peerless Insurance Company's ("Defendant" or "Peerless") motion for summary judgment or, in the alternative, partial summary judgment. *See* Dkt. # 28. After considering the arguments presented in the moving, opposing, and reply papers, and at a hearing on January 5, 2015, the Court GRANTS IN PART and DENIES IN PART the motion.

I.    Background

Defendant Peerless Insurance Company ("Peerless") issued a commercial insurance policy – CBP 1017237 (the "Policy") – to Plaintiff CV Ice Company, Inc. ("CV Ice") for the policy period December 7, 2012 to December 7, 2013. *See Plaintiff's Response to Uncontroverted Facts* ("Pl. Response") ¶¶ 1-3. CV Ice is a company that makes and supplies large-scale block ice and packaged ice for customers in the Coachella Valley, Imperial Valley, and surrounding areas. *See Opp.* 1:16-2:2. CV Ice was formed in 2001, when its owners purchased two existing ice plants and associated property out of bankruptcy. *See Pl. Response* ¶ 67. This lawsuit concerns CV Ice's block ice making system, located at 83796 Date Avenue in Indio, California ("Date Avenue Plant"). *See Def. Response* ¶ 2.

The block ice making system is enclosed in a large steel tank (78 feet long, 30 feet wide, and 6 feet deep) that is built into the floor of the building. *Id.* ¶ 3. In the 1970s, CV Ice's predecessor installed a 12,000-foot piping system made from two-inch, Type F, butt-welded furnace pipe tightly coiled in rows throughout the steel tank. *Id.* ¶¶ 4-5. The piping system is welded into the walls and floor of the tank. *Id.* ¶¶ 5-6. To make the block ice, the coiled pipes, which are submerged in a salt-water solution known as "brine" that fills the steel tank, are flooded with pressurized anhydrous ammonia. *Id.* ¶ 7. Large baskets, each containing six cans filled with water, are lowered by a hoist into the brine solution, with a row of piping between each basket. *Id.* ¶ 8. Each can is capable of making a 300 pound block of ice. *Id.* The top of

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-121 PSG (SPx) | Date | January 6, 2015 |
|---|---|---|---|
| Title | CV Ice Company, Inc. v. Golden Eagle Insurance Company, *et al.* | | |

the tank has a deck on it that keeps the baskets in the brine until it is time for them to be hoisted out of the tank. *Id.* ¶ 9. At that time, the ice is harvested. *Id.*

The incident at the center of this insurance dispute occurred on July 27, 2013, during the appropriate policy period. *See Pl. Response* ¶ 14. On August 1, 2013, Kevin Mason ("Mason"), the President of CV Ice, reported a claim to Peerless.[1] *Id.* On July 27, 2013, personnel at the Date Avenue Plant smelled ammonia and started emergency procedures to find the leak and prevent the further release of ammonia. *See Pl. Statement of Genuine Disputes of Material Facts* ("Pl. Statement") ¶ 17. After purging the pipe system of ammonia and draining the brine from the tank, CV Ice could discern what had happened. *See id.* ¶¶ 17-18. One of the heavy baskets had dropped onto the tank's deck, causing an angle iron on the deck to fall into the tank and strike and puncture a pipe. *See id.* ¶ 18. Peerless does not dispute that the impact damage to the pipe that occurred on July 27, 2013 is a covered loss under the Policy. *Sullivan Decl.*, Ex. 16 ["September 9 Coverage Letter"] at p.107.

On August 12, 2013, Peerless claim representative Richard Gutierrez ("Gutierrez") inspected the block ice system with a retained engineering consultant, Robert Underwood ("Underwood") of Werlinger and Associates. *See Pl. Response* ¶ 16. After that inspection, Underwood advised Mason that it appeared that the impact damage could be fixed with an isolated weld repair. *Id.*

CV Ice's retained refrigeration industry expert – Alliance Industrial Refrigeration Services, Inc. ("Alliance") – was also present at the Date Avenue Plant on August 12, 2013. *See Pl. Statement* ¶ 23. Alliance's report after that inspection indicated that the pipe could not be repaired because the CV Ice ammonia piping was seamed and current codes require seamless ammonia piping. *See McKeon Decl.*, Ex. 37 ["Alliance Report"] at 2. Alliance presented two code compliance options for repair – replacing the 12,000 feet of existing piping with seamless pipe (~ $517,000) or replacing the piping system with a modern pipeless system (~ $425,60). *Id.* at 2-3. Alliance's opinion was informed by a consultation with Miguel Anderson ("Anderson"), an expert welder from STL Fabrication who informed Alliance that repair by welding was not permitted by the applicable codes or logistically feasible due to the corroded state of the damaged pipe. *See id.*, Ex. 40-41.

At some point after the accident, Mason contacted the Riverside Country Department of Environmental Health ("DEH") to report the ammonia leak. *Id.* ¶ 17. The directive issued by the DEH in this matter is relevant because part of this dispute involves whether the DEH's instructions regarding the piping system triggered additional coverage within the meaning of one

---

[1] Although the Policy was issued by Peerless, much of the correspondence regarding the claim refers to the claim administrator "Liberty Mutual." *See Mot.* 6:11, n.3.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-121 PSG (SPx) | Date | January 6, 2015 |
|---|---|---|---|
| Title | CV Ice Company, Inc. v. Golden Eagle Insurance Company, *et al.* | | |

of the Policy's endorsements. The DEH inspector Brad Ballen ("Ballen") states that he received notice of the leak on August 15, 2014 and inspected the Date Avenue Plant the following day, August 16, 2014. *See Sullivan Decl.*, Ex. 7 ["DEH Inspection Report"] at p.79. Ballen's inspection report identified CV Ice's block ice making system as being in violation of Health & Safety Code Chapter 6.95, California Code of Regulations Title 19 Chapter 4.5, "I. Maintained and Operated to Minimize the Possibility of a Release[,]" referring to release of ammonia. *Id.* at p.78. The report explains:

> Inspection of random sections of the heat exchanger piping showed the piping to be very badly corroded and pitted throughout the entire length of this line. All of this piping is very susceptible to failure due to corrosion even if it is not mechanically damaged again. This system should not be placed back into service until all defective piping has been replaced.
>
> Violation: The stationary source is not operating and/or maintaining the covered process in such a manner as to minimize the possibility of a release. Heat exchanger piping in the ice making tank could fail due to severe corrosion releasing anhydrous ammonia into the environment.
>
> Correction: …The heat exchanger piping in the ice making tank must be replaced prior to restarting the system.

*Id.* at p.78.

Ballen had been making periodic visits to the CV Ice facility since 1991, but he had never actually seen the ammonia piping before the August 16, 2013 visit because the piping had always been covered. *See Sullivan Decl.*, Ex. 28 ["Ballen Depo."] at 110:16-111:2. Ballen explained: "Normally, this piping is not exposed. It's submerged under brine and it usually has covers over it all, so during the course of my previous inspections it's not something I would have been able to see unless there was some great effort on the facility's part to, you know, drain the swamp, so to speak, so I could see what alligators are in there." *Id.* at 110:8-15. Prior to the accident, on May 30, 2013, Ballen had inspected and cleared the Date Avenue Plant; however, Ballen's deposition clarifies that he did not visually inspect the pipes on that occasion (or any other occasion). *See id.* 110:6-111:2; *McKoen Decl.*, Ex. 33.

CV Ice started incurring expenses due to the inoperative block ice making system since its shutdown on July 27, 2013. *See Sullivan Decl.*, Ex. 8 at p.86. On August 19, 2013, Peerless authorized a payment of $50,000 to CV Ice based on Mason's assertion that he would expend

Case 5:14-cv-00121-PSG-SP Document 62 Filed 01/06/15 Page 4 of 18 Page ID #:2187

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-121 PSG (SPx) | Date | January 6, 2015 |
|---|---|---|---|
| Title | CV Ice Company, Inc. v. Golden Eagle Insurance Company, *et al.* | | |

over $47,000 in connection with the purchase and handling of replacement ice by the end of August. *See Pl. Response* ¶ 23; *Sullivan Decl.*, Ex. 8-9.

On August 23, 2014, a group inspection and meeting was held at the Date Avenue Plant. Peerless Claims Manager Phillip White inspected the block ice making system, accompanied by the following individuals: Underwood, Frank Jackman ("Jackman") of FJR Pacific Industrial Refrigeration ("FJR Pacific"), registered mechanical engineer Adam Johnson ("Johnson") of FJR Pacific, certified welder Rick Jackman of FJR Pacific, Shahram Sheybany ("Sheybany") of Pacific Metallurgical, and Robert Distaso ("Distaso"). *See Pl. Response* ¶¶ 24-25. Ballen also attended at Peerless' request. *Id.* ¶ 26.

Following this inspection, Ballen issued a supplemental inspection report. *Id.* ¶ 27; *Sullivan Decl.*, Ex. 12 ["Ballen Supplemental Report"]. He summarized that the group discussed repair options, "including replacement of severely corroded piping, replacing all piping regardless of its condition and changing the entire process to eliminate any piping within the ice making tank." *Id.* Ballen indicated that he "left the meeting with the understanding that the group would decide what actions would be taken to place the system back into operation and that they would present their decision to me at a later date for my review." *Id.*

On August 30, 2013, FJR Pacific issued a piping repair proposal to Peerless. *Pl. Response* ¶ 36; *Sullivan Decl.*, Ex. 13 ["FJR Proposal"]. Contrary to CV Ice's Alliance-generated report, the FJR Proposal concluded that the damaged section of pipe could be repaired in compliance with current code requirements. *FJR Proposal*. FJR Pacific explained that although the applicable guidelines no longer permit Grade F carbon steel piping (the piping in the Date Avenue Plant system) to be used for ammonia refrigeration, the standard only applies to components installed after its adoption and a repair to an existing pipe is not covered within any of the standards. *Id.* FJR Pacific estimated that the repair process would take three days and cost no more than $10,000. *Id.*

Having concluded its investigation, Peerless sent CV Ice a letter explaining its coverage position regarding the July 27, 2013 incident. *Pl. Response* ¶ 43. Peerless reported its conclusion that the Policy covers the direct physical damage to the ammonia piping, but not the damage caused by corrosion and deterioration of the 40-year-old piping system. *September 9 Coverage Letter* at p.107. Peerless determined that the impacted section of pipe could be repaired, both logistically and legally, because it found that the damaged pipe section had acceptable wall thickness (it was not too corroded) and that a Type F patch job was permissible under the guidelines. *Id.* at p.106. Thus, Peerless would cover the cost of repairing the direct physical damage to the pipe that occurred on July 27, 2013 as well as the loss of business/extra expense associated with an isolated weld repair of the ammonia piping.. *Id.* at p.107-10.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-121 PSG (SPx) | Date | January 6, 2015 |
|---|---|---|---|
| Title | CV Ice Company, Inc. v. Golden Eagle Insurance Company, *et al.* | | |

     CV Ice immediately disputed this coverage position. *See Mot.* 9:18. Mason followed up with Ballen at the DEH, asking for clarification about whether existing laws permitted a weld repair under the circumstances. *Pl. Response* ¶ 48. Ballen responded that his "intent is not only the damaged section of piping be replaced, but that any and all piping that is subject to failure due to extensive corrosion be replaced." *Sullivan Decl.,* Ex. 17 at p.111. CV Ice's position was that the DEH and pertinent laws and regulations required complete replacement of all piping or the installation of a new system before allowing operations to resume, and the Policy covers those costs under a number of provisions.

     On September 24, 2013, Peerless sent CV Ice its final coverage letter. S*ee Pl. Response* ¶ 50; *Sullivan Decl.*, Ex. 18 ["September 24 Coverage Letter"]. In this letter, Peerless reiterated its position communicated on September 9, 2013 and stated the following regarding the DEH issues:

> With respect to issues raised by DEH…those issues pertain to deficiencies (pre-existing conditions) such as corrosion/maintenance issues found in the block ice tank system…Our estimate reflects what it would cost to repair the ammonia piping in the absence of all other conditions and circumstances currently existing in the block ice tank system. We recognize that once the repair solution has been completed, Mr. Ballen may not authorize CV Ice to place the system back in operation due to various violations related to corrosion, deterioration of the piping system or maintenance related items etc. that are excluded under the policy.

*September 24 Coverage Letter* at p. 126.

     To date, Peerless has paid CV Ice for its net loss calculated as follows:

        Production Equipment (based on repair): $10,000
        Extra Expense (incurred from
            July 27 to Aug. 31, 2013):    $57,102
        Subtotal:    $67,102
        Deductible:    ($5,000)
        Net Loss:    $62,102

*Pl. Response* ¶ 58. The $62,102 sum includes the $50,000 amount advanced on August 19, 2013.

     Instead of conducting the weld repair, CV Ice elected to install a different ice block making system that operates using "plate chiller" technology rather than the pipe technology. *See id.* ¶¶ 59-60, 65. CV Ice contracted with FJR Pacific to procure the new plate chiller system.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-121 PSG (SPx) | Date | January 6, 2015 |
|---|---|---|---|
| Title | CV Ice Company, Inc. v. Golden Eagle Insurance Company, *et al.* | | |

*Id.* ¶ 65. Also, during the time that CV Ice was addressing the ice block system issues, it was engaged in sale negotiations with Arctic Glacier USA, Inc. ("Arctic Glacier"). *Id.* ¶ 69. CV Ice has since sold the new plate chiller system to Arctic Glacier, but retains ownership of the Date Avenue Plant property and leases it to Arctic Glacier for $12,500 per month. *Id.* ¶¶ 70-72.

On December 12, 2013, CV Ice filed this lawsuit against Peerless, Golden Eagle Insurance Company, and Liberty Mutual alleging (1) breach of contract and (2) tortious breach of implied covenant of good faith and fair dealing. *See* Dkt. # 1. Defendants subsequently removed the case. *Id.* CV Ice voluntarily dismissed the other Defendants in the case on February 20, 2014, so Peerless is the only remaining Defendant. *See* Dkts. # 13-14. Trial is set in this case for February 10, 2015. *See* Dkt. # 18. CV Ice moves for summary judgment as to both causes of action, or, in the alternative, partial summary judgment as to particular issues outlined in the Discussion Section below. *See* Dkt. # 28.

II.     Legal Standard

Federal Rule of Civil Procedure 56(a) establishes that a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party may move for summary judgment not only as to an entire case, but also as to a claim, defense, or part of a claim or defense. *Id.* The movant bears the initial burden to demonstrate the lack of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant satisfies the burden, the nonmovant must set forth specific evidence showing that there remains a genuine issue for trial, and "may not rest upon mere allegation or denials of his pleading." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

An issue of fact is a genuine and material issue if it cannot be reasonably resolved in favor of either party and may affect the outcome of the suit. *See id.* at 249-50. A party asserting that a fact cannot be genuinely disputed must support that assertion by citing to "materials in the record, including depositions, documents, electronically stored information, affidavits or interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). On summary judgment, the Court may not weigh conflicting evidence or make credibility determinations. *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). It must draw all reasonable inferences in the light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255; *Soremekun*, 509 F.3d at 984.

III.    Discussion

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-121 PSG (SPx) | Date | January 6, 2015 |
|---|---|---|---|
| Title | CV Ice Company, Inc. v. Golden Eagle Insurance Company, *et al.* | | |

Peerless argues that it is entitled to summary judgment disposing of this case in its entirety. *See Mot.* 21:1-25:11. Alternatively, Peerless asks for partial summary judgment on the following issues:

(1) Whether Peerless has an obligation to pay for any loss, cost or expense to remediate corrosion or deterioration of the piping system and related equipment;

(2) Whether the Policy's "Increased Cost of Construction Coverage" and "Ordinance or Law Coverage" apply to any expense or delay caused by demands by the DEH that CV Ice ensure that the aged and corroded piping would not fail in the future;

(3) Whether the Policy's "Business Income" and "Extra Expense" coverage applies only to the amount of time that would have been reasonably necessary to repair the impact damage and restore the system to its pre-loss functionality; and/or

(4) Peerless' liability for the breach of implied covenant of good faith and fair dealing claim.

*Id.* 21:11-22; 22:22-25:11.

The Court will first address whether a genuine dispute of material fact prevents summary judgment in this case. Then, if necessary, the Court will address Peerless' partial summary judgment arguments.

  A. <u>Complete Summary Judgment Analysis</u>

Full resolution of this coverage dispute requires analysis of the following issues: (1) whether a covered loss occurred; (2) whether an isolated weld repair was an appropriate remedy for the covered loss under the terms of the Policy; (3) whether five weeks was an appropriate "period of restoration" for business income and extra expenses calculations; and (4) whether Peerless compensated CV Ice for all categories of loss covered under the Policy (*i.e.*, not CV Ice's initial emergency repairs, damage to other machinery, and costs of re-starting operations). If the parties, through genuinely conflicting evidentiary showings, disagree about any facts that are necessary to the Court's determination of these issues, complete summary judgment is inappropriate.

    i. *Covered Loss*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-121 PSG (SPx) | Date | January 6, 2015 |
|---|---|---|---|
| Title | CV Ice Company, Inc. v. Golden Eagle Insurance Company, *et al.* | | |

The Policy's general coverage statement provides that Peerless "will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations by or resulting from any Covered Cause of Loss." *See Sullivan Decl.*, Ex. 1 ["Policy"] at 66. Peerless does not dispute that the impact damage to the refrigerant piping constituted direct physical damage to Covered Property under the Policy. *See Mot.* 12:17-18. Further, Peerless does not dispute that the falling basket was a Covered Cause of Loss. *See id.* 12:18-19. Peerless attempts to head off the argument that corrosion, wear and tear, and deterioration are Covered Causes of Loss under the Policy; however, CV Ice does not assert that position. *See id.* 12:26-13:3; *Opp.* 15:17-23 ("this loss was not 'caused by or resulting from' 'wear and tear' – it was caused by an 1800 pound ice basket falling on an angle iron and driving that angle iron into ammonia piping"). Accordingly, the parties agree that the basket incident is a Covered Cause of Loss and that it was the only Cause of Loss acting as a trigger for coverage in this lawsuit. Peerless readily admits that this Cause of Loss resulted in direct physical damage to Covered Property; the dispute centers on what the Policy required Peerless to pay to remedy this covered loss.

        *ii.*      *Isolated Weld Repair*

Peerless' coverage position regarding the physical damage caused by the basket incident is that it was only required to pay the cost of repairing the portion of piping directly damaged by the impact. *See Mot.* 8:24-9:3; *September 9 Coverage Letter* at p.107; *September 24 Coverage Letter* at p.125-26. Peerless relied on the report of its industrial refrigeration expert, FJR Pacific, in reaching this decision. *See Mot.* 8:25-9:3. FJR Pacific reported that it could complete the repair in three days for $10,000; therefore, Peerless paid CV Ice $10,000 (less a $5000 deductible) for the physical damage caused by the basket incident. *See FJR Proposal*; *Mot.* 10:1-3. This isolated weld repair would involve, generally: (1) cleaning the surface of the existing pipe, (2) cutting out a roughly 6-inch segment of clean pipe (where the puncture is located) with a metal blade, (3) welding a replacement portion of pipe into the gap, and (4) conducting visual and pressure tests of the welds. *See FJR Proposal*.

CV Ice contends that an isolated weld repair is an unacceptable repair method under the circumstances for three reasons: (1) the punctured pipe segment could not take a new weld due to extreme rusting; (2) the applicable codes prohibit weld repair with Type F material piping; and (3) the DEH would not accept the isolated weld repair option.

CV Ice's first argument – that an isolated weld repair was infeasible due to the rust around the punctured segment of the pipe – contradicts the FJR Proposal indicating that a weld repair could be conducted logistically and according to all applicable codes. *Id.* However, CV Ice refutes that finding with its own expert opinions. *See Opp.* 6:21-28. When Alliance, CV

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-121 PSG (SPx) | Date | January 6, 2015 |
|---|---|---|---|
| Title | CV Ice Company, Inc. v. Golden Eagle Insurance Company, *et al.* | | |

Ice's retained refrigeration industry expert, was investigating repair options, it consulted with its expert welder, Miguel Anderson. *See McKeon Decl.*, Ex. 40. In an August 13, 2013 email to personnel at Alliance, Anderson explained that after conducting a "job walk" at the Date Avenue Plant, he reached the professional conclusion that "the existing pipe is corroded to a point that will not allow [his welding company] to 'tie-in' to existing lines." *Id.* He referenced an engineering standard entitled "Preparation for Welding" located at ASME B31.3 § 328.4 requiring that "internal and external surfaces to be welded shall be clean and free from paint, oil, rust, scale, and other material that would be detrimental to either the weld or the base metal" and concluded that "[p]er this section and the existing field conditions, [his welding company] will not be able to 'tie-in' to existing pipe." *Id.*

The following day, Anderson forwarded the report of a professional engineer at his company to Alliance reiterating the infeasibility of an isolated weld repair:

> Gentleman: In regards to the welding procedure for pipes which have been exposed to ammonia for an extended period of time; I regret to inform you that due to the 'stress corrosion' induced by the ammonia on to the steel, welding of these pipes is not feasible because any welding will cause the pipe to crack due to the presence of oxygen. I am NOT aware of any welding process in an oxygen free environment since oxygen is necessary for combustion.

*See McKeon Decl.*, Ex. 41.

During a deposition taken on October 16, 2014, Anderson further described the welding issues posed by rust and corrosion. *See id.*, Ex. 42 ["Anderson Depo"]. Anderson explained that the rust that develops on steel when it sits in brine for 30 years poses two problems for welding. *Id.* 36:11-37:12. First, the code prohibits welding when the steel is rusted. *Id.* Second, when "it is rusted to that point, if you try to weld it, all it does is just continue to melt away the existing steel." *Id.* He continued that "it was full of – the entire system was – contained rust" and that is was not feasible to simply grind down the rust where he was doing the welding because "[w]hen you grind down the rust, it just falls apart. There is nothing that you're going to get underneath it that you can actually weld to." *Id.* at 42:7-19.

Based on this conflicting evidence as to whether it was feasible – either logistically or legally – to repair the punctured portion of the pipe by isolated weld repair, the Court easily concludes that summary judgment is not appropriate in this case. A reasonable jury could believe CV Ice's experts at trial and conclude that Peerless could not have conducted an isolated repair weld; therefore, the Policy required Peerless to pay for a different, necessarily more expensive, option to restore CV Ice's block making system to its pre-loss functionality.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-121 PSG (SPx) | | Date | January 6, 2015 |
|---|---|---|---|---|
| Title | CV Ice Company, Inc. v. Golden Eagle Insurance Company, *et al.* | | | |

    B.    <u>Partial Summary Judgment Analysis</u>

Having determined that summary judgment as to the entire case is not appropriate, the Court turns to Peerless' arguments for partial summary judgment as to particular issues.

    *i.*    *Ordinance or Law Coverage*

A primary contested issue in this case is the applicability of the "Ordinance or Law Coverage" ("OL Coverage") endorsement. This endorsement provides the following:

> If a Covered Cause of Loss occurs to covered building property, we will pay…for the loss in value of the undamaged portion of the building as a consequence of enforcement of any ordinance or law that:
>
>     a)  Requires the demolition of parts of the same property not damaged by a Covered Cause of Loss.
>
>     b)  Regulates the construction or repair of buildings, or establishes zoning or land use requirements at the described premises; and
>
>     c)  Is in force at the time of loss[.]

*Policy* at 116.[2] CV Ice contends that this provision obliges Peerless to pay for the cost of complying with laws and DEH directives that required CV Ice to replace all 12,000 feet of its current piping system in order to resume code-compliant operations. *See Opp.* 16:24-19:1. Peerless maintains that the particular laws and directives facing CV Ice do not trigger OL Coverage in this situation. *See Reply* 3:9-6:28.

Peerless asks the Court to conclude as a matter of law that this provision did not obligate Peerless to replace all 12,000 feet of existing piping because CV Ice did not identify a law or ordinance regulating the construction or repair of buildings that required demolition of the pipe segments that did not suffer impact damage. CV Ice argues that its loss triggered OL Coverage under two theories: (1) the laws regulating permissible refrigerant pipe material, and (2) the DEH's directive regarding the conditions under which the system could resume operations.

    *a. Pipe Material Issue*

---

[2] Peerless argues against "Increased Cost of Construction Coverage" as well, but CV Ice does not rely on that provision in its coverage argument.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-121 PSG (SPx) | Date | January 6, 2015 |
|---|---|---|---|
| Title | CV Ice Company, Inc. v. Golden Eagle Insurance Company, *et al.* | | |

CV Ice argues that the California Mechanical Code and incorporated standards prohibited an isolated weld repair due to the block ice making system's outdated piping material. *See Opp.* 17:13-17. In July 2013, the system was comprised of Type F butt-welded furnace pipe. *See Def. Response* ¶ 5. The California Mechanical Code incorporates the standards of "IIAR 2," a set of guidelines promulgated by the International Institute of Ammonia Refrigeration. *See FJR Proposal*; 24 C.C.R. § 1102.1. Alliance's report explained that the IIAR standards do not currently allow for seamed pipe, like the Type F piping used in the block ice making system, for ammonia refrigeration systems; therefore, Alliance could not perform a code-compliant isolated weld repair and recommended that CV Ice remove all seamed pipe to fix the system. *See Alliance Report* at p.2. These codes and standards regulate permissible building materials in ammonia refrigeration systems, thus, they are laws that, if they require the demolition of the undamaged parts of the Covered Property, give rise to OL Coverage.

However, Peerless contends that Alliance misinterpreted the IIAR 2 standards regarding a weld repair of Type F piping, and the Court agrees. *See Reply* 3:27-4:1. The FJR report explained that while under the operative IIAR 2 standards, new installations for ammonia refrigerant piping cannot be Type F pipe, "a repair to an existing portion of pipe is not covered within any of the standards. Replacing a section of damaged pipe is a common practice and usually does not require much scrutiny." *See FJR Proposal*. Review of the IIAR 2 standards supports this expert interpretation of permissible repair practice.

First, the IIAR 2 standard does not govern ammonia refrigeration systems that existed prior to the adoption of the standard. *See* IIAR 2 (2008) § 2.2 ("This standard applies: (a) To equipment and systems designed, manufactured and installed subsequent to adoption of this standard; (b) To parts or components installed after the adoption of this standard."). Accordingly, the Date Avenue Plant system, installed in the 1970s, was not generally subject to the IIAR 2 standard. Regarding whether repairs are governed by the IIAR 2 requirements, the standard lists an exception stating that the standard does not apply to the following: "replacements in kind that meet the design intent for the original application." *See id.* An isolated weld repair – replacing a small segment of piping with an identical segment of piping to fix a puncture – constitutes a replacement in kind of piping to enable the system to continue to make block ice as originally designed. Therefore, the Court agrees with Defendant's expert's finding that Defendant's contemplated repair was not covered by the IIAR 2 standard.

Accordingly, the Court concludes that the California Mechanical Code and IIAR 2 standards regarding permissible piping materials did not prohibit an isolated weld repair to the Type F pipe (and thus require demolition of the existing Type F system).

    b. *DEH Issue*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-121 PSG (SPx) | Date | January 6, 2015 |
|---|---|---|---|
| Title | CV Ice Company, Inc. v. Golden Eagle Insurance Company, *et al.* | | |

CV Ice's argument regarding the DEH directive's giving rise to OL Coverage is flawed on multiple grounds. First, the DEH was not acting to enforce an ordinance or law that "[r]egulates the construction or repair of buildings," thus, its directive did not trigger OL Coverage. Secondly, the Covered Cause of Loss did not *cause* the DEH to issue its violation regarding the block ice making system.

The Policy indicates that Peerless "will pay…for the loss in value of the undamaged portion of the building as a consequence of enforcement of any ordinance or law that…[r]egulates the construction or repair of buildings[.]" Peerless explains that, in relation to CV Ice, the DEH was acting pursuant to authority under the California Health & Safety Code and its implementing regulations to prevent the release of hazardous materials. *See Mot.* 15:11-21 (citing Cal. H&S Code § 25533; 19 C.C.R. § 2735.5). The DEH was enforcing laws regarding the safe managing of hazardous substances, not the construction or repair of structures (for example, the permissible building materials or welding conditions). The DEH is not enforcing the California Mechanical Code and related standards discussed above. CV Ice does not adequately respond to this point. The opposition cites to the portion of the Health & Safety Code demonstrating that the DEH has the authority to issue fines to assure compliance with its directives. *See Opp.* 17:18-18:9. That the DEH has the authority to compel enforcement through a fining mechanism does not establish that it issued its CV Ice directive pursuant to an ordinance or law regulating the *construction or repair* of the piping system. The burden of proof on the applicability of the OL Coverage provision rests with CV Ice, and it failed to demonstrate that the DEH was enforcing an ordinance or law regulating the construction or repair of buildings, as required by the Policy. *See MRI Healthcare Center of Glendale, Inc. v. State Farm General Ins. Co.*, 187 Cal. App. 4th 766, 777 (2010) (in a first party claim, "the burden is on the insured to prove facts establishing that the claimed loss falls within the coverage provided by the policy's insuring clause").

Moreover, CV Ice's argument regarding the DEH directive's giving rise to OL Coverage is flawed on causation grounds. The Covered Cause of Loss did not trigger the DEH violation and correction directive in any way other than putting the DEH on notice of a problematic condition that the evidence demonstrates existed prior to the July 27, 2013 incident. The OL Coverage provision does not explicitly state that the Covered Cause of Loss must trigger enforcement of a law requiring demolition of undamaged property in order for the compliance costs to be covered under the Policy, but it is the only logical interpretation of the provision. *See MarkWest Hydrocarbon, Inc. v. Liberty Mut. Ins. Co.*, 558 F.3d 1184, 1191 (10th Cir. 2009) (interpreting an ordinance or law provision that states the causation requirement explicitly: "In the event of loss or damage by an insured peril…*that causes* the enforcement of any law or ordinance regulating the construction or repair [of] damaged facilities, underwriters shall be

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-121 PSG (SPx) | Date | January 6, 2015 |
|---|---|---|---|
| Title | CV Ice Company, Inc. v. Golden Eagle Insurance Company, *et al.* | | |

liable for…Increased cost of repair or reconstruction of the damaged and undamaged facility…") (emphasis added).

The logical boundaries to the scope of OL Coverage are best explained by analogy to a hypothetical. A store has a general commercial liability insurance policy. Two laws apply to the store: (1) a law requiring a wheelchair accessible restroom, and (2) a law requiring fire sprinklers. The laws are different in that the restroom law does not require immediate action – the storeowner does not need to close shop and expand the bathroom right away, but if the storeowner decides to remodel other aspects of the store, it must also expand the bathroom at that time. The fire sprinkler law is immediately applicable; if the store does not have working fire sprinklers at any time, it is violating the law.

In the hypothetical, the store does not have a wheelchair accessible restroom or fire sprinklers. However, if an inspector came to check the store's compliance, it would only issue a violation for the sprinklers because the store owner's obligation to expand that bathroom has not been triggered.

One day, a car crashes into the storefront. The accident is a covered cause of loss under the insurance policy and its repair requires a substantial rebuild of the front façade of the store. This rebuild triggers the obligation under the wheelchair accessibility law to expand the bathroom in the back of the store. It is entirely logical that, under an expansive OL Coverage provision, the insurance company would have to pay not only for the storefront rebuild, but also for the cost of expanding the existing restroom, even though it was undamaged, because the covered cause of loss triggered obligations under a law regarding restroom construction. However, in this scenario, the insurance company would not also be obligated to pay for installing fire sprinklers at this time because that deficiency and obligation pre-dated the occurrence of the covered cause of loss. If a causation requirement is not read into the OL Coverage provision, the results are absurd.[3] Any covered cause of loss would thrust upon the insurer an obligation to bring the entire insured property up to various building codes when that obligation was already alive and rightfully resting on the insured just prior to the covered cause of loss.

Accordingly, if the DEH violation addresses and issue that pre-dated the July 27, 2013 basket incident, the action required to remedy that violation cannot be the responsibility of the insurance company under the OL Coverage provision because the basket incident did not trigger

---

[3] Although contract interpretation in the insurance context heavily favors the insured, courts are only required to interpret ambiguities to protect the "objectively *reasonable* expectations of the insured." *See Minkler v. Safeco Ins. Co. of America*, 49 Cal. 4th 315, 321 (2010) (internal quotation omitted) (emphasis added).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-121 PSG (SPx) | Date | January 6, 2015 |
|---|---|---|---|
| Title | CV Ice Company, Inc. v. Golden Eagle Insurance Company, *et al.* | | |

enforcement of a legal obligation, as contemplated by the provision. Like the situation in *MarkWest* in which the 10th Circuit denied coverage under a similar OL Coverage provision, the covered loss was the cause of the violation "only in the sense that it gave notice to the [government agency]" that the system was vulnerable due to another issue – corrosion. *See MarkWest*, 558 F.3d at 1189.

      CV Ice appears to recognize the need to demonstrate that the DEH directive was issued as a result of the covered loss when it asserts that "Ballen's Order occurred because of the covered loss and addressed the repair of the piping system that was damaged in the July 2013 accident." *See Opp.* 18:16-17. Vitally, CV Ice argues that Ballen and the DEH would not have shut down the system had the accident not taken place because Ballen had certified the system as safe in May 2013, just two months prior to the accident. *Id.* 10:12-16. However, CV Ice's theory of causation is not supported by the evidence, and the May 2013 system approval can be quickly explained away.

      In his report issued after inspecting the system on August 16, 2013, Ballen indicated that the system was not being maintained in a way to minimize the possibility of an ammonia release due to severe corrosion throughout the piping which renders the piping very susceptible to failure. *DEH Inspection Report* at p.78. Ballen's supplemental report, issued after a second inspection on August 23, 2013, also indicates that the DEH's concerns are about the corrosive state of the piping system. *See Ballen Supplemental Report.* While CV Ice is correct that Ballen had just approved the block ice making system in May 2013, Ballen did not actually *see* the ammonia piping on that occasion or on any of his periodic visits to the facility since 1991 because the piping had always been covered. *See Ballen Depo.* at 110:16-111:2. Ballen explained: "Normally, this piping is not exposed. It's submerged under brine and it usually has covers over it all, so during the course of my previous inspections it's not something I would have been able to see unless there was some great effort on the facility's part to, you know, drain the swamp, so to speak, so I could see what alligators are in there." *Id.* at 110:8-15.

      Accordingly, the evidence demonstrates that the DEH's violation and directive were issued in response to system-wide corrosion, not the July 27, 2013 isolated basket impact, and had Ballen visually inspected the drained system on July 26, 2013, he would have issued the same violation and repair directive at that time.
      Based on the uncontroverted evidence, the Court concludes that the Covered Cause of Loss did not trigger the obligation of the laws that the DEH was enforcing; therefore, Peerless is not responsible for the cost of remedy the DEH violation and complying with its directive under the Policy's OL Coverage provision.

      Accordingly, the Court GRANTS Peerless' request for a ruling of law on this matter and

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-121 PSG (SPx) | Date | January 6, 2015 |
|---|---|---|---|
| Title | CV Ice Company, Inc. v. Golden Eagle Insurance Company, *et al.* | | |

concludes that the OL Coverage provision does not require Peerless to pay for any expense or delay caused by demands by the DEH that CV Ice ensure that the aged and corroded piping would not fail in the future.

        *ii.*        *Period of Restoration*

Peerless further requests that the Court rule as a matter of law that the Policy's "Business Income" and "Extra Expense" coverage applies only to the amount of time that would have been reasonably necessary to repair the impact damage and restore the system to its pre-loss functionality. *See Mot.* 21:20-22. Because the Court denied summary judgment on the issue of whether the isolated weld repair was a proper remedy for the physical impact damage that occurred on July 27, 2013, the Court cannot make a specific ruling as to the number of weeks or months that make up the restoration period. The Court will not issue partial summary judgment using the language suggested by Peerless because it does not discern any value in recasting the generally phrased obligations contained in the Policy itself. The issue of the appropriate period of restoration (and thus, the lost Business Income and Extra Expense incurred) under the Policy will be decided specifically, rather than abstractly, at trial after the jury has decided which repairs or replacements that Peerless was obligated to provide under the Policy. Accordingly, the Court DENIES Peerless' partial summary judgment on the period of restoration issue.

        *iii.*        *Implied Covenant of Good Faith and Fair Dealing*

Lastly, Peerless requests that the Court issue partial summary judgment declaring that, as a matter of law, Peerless did not breach the implied covenant of good faith and fair dealing in denying the full extent of coverage demanded by CV Ice. *See id.* 22:22-25:11. "A breach of the implied covenant of good faith and fair dealing involves something beyond the breach of the contractual duty itself, and it has been held that bad faith implies unfair dealing rather than mistaken judgment." *See Chateau Chamberay Homeowners Ass'n v. Associated Intern. Ins. Co.*, 90 Cal. App. 4th 335, 345 (2001) (internal quotations omitted). "Thus, an insurer's bad judgment or negligence is insufficient to establish bad faith; instead, the insurer must engage in a conscious and deliberate act, which unfairly frustrates the agreed common purposes [between the parties] and disappoints the reasonable expectations of the other party thereby depriving that party of the benefits of the agreement." *Nieto v. Blue Shield of Cal. Life & Health Ins. Co.*, 181 Cal. App. 4th 60, 86 (2010) (internal quotation omitted).

In a breach of the implied covenant of good faith and fair dealing inquiry, the "ultimate test is whether the insurer's conduct was reasonable." *Id.* Accordingly, "when there is a genuine issue regarding an insurer's liability under the policy the claim asserted by the insured…there can be no bad faith liability imposed on the insurer for advancing its side of that

Case 5:14-cv-00121-PSG-SP   Document 62   Filed 01/06/15   Page 16 of 18   Page ID #:2199

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-121 PSG (SPx) | Date | January 6, 2015 |
|---|---|---|---|
| Title | CV Ice Company, Inc. v. Golden Eagle Insurance Company, *et al.* | | |

dispute." *See MRI Healthcare Center of Glendale, Inc. v. State Farm General Ins. Co.*, 187 Cal. App. 4th 766, 784 (2010). When there is a genuine dispute regarding the extent of the insurer's liability, "[w]hether the insurer has acted in bad faith may be decided as a matter of law[.]" *Id.* A "single, thorough report by an independent expert is sufficient, all other things being equal, to support application of the 'genuine dispute' doctrine" and conclude that bad faith liability is inappropriate as a matter of law. *See Keshish v. Allstate Ins. Co.*, 959 F.Supp.2d 1226, 1236 (C.D. Cal. 2013) (internal quotation omitted) (granting summary judgment in favor of the insurer on the implied covenant claim when the insurer relied on its expert's appraisal, even though the appraisal was one-tenth of the amount of the insured's estimate).

Peerless argues that it acted reasonably in reaching its coverage decision because it relied on expert opinions and a reasonable interpretation of the Policy language. CV Ice argues that a jury could find that Peerless acted unreasonably in two ways: first, in refusing to pay for replacement of the entire piping system and second, even if an isolated weld repair was the appropriate remedy under the Policy, in applying too short a period of restoration and failing to provide coverage for other expenses related to the impact damage.

The Court concludes that there was a genuine dispute between Peerless and CV Ice as to whether the Policy and applicable laws permitted an isolated weld repair or replacement of a greater portion of the ice making system. Regarding the feasibility of an isolated weld repair, Peerless relied on the report of its expert FJR Pacific. *See Mot.* 24:4-19; *FJR Proposal*. Regarding the permissibility of that repair option under the California Mechanical Code and IIAR 2 standards, Peerless likewise relied on the FJR expert report. *Id.* Finally, regarding whether the OL Coverage provision nonetheless required Peerless to pay for replacing the corroded pipe system so that the DEH would allow CV Ice to resume operations, Peerless reasonably interpreted the language of its Policy – as confirmed by the Court interpreting the relevant provision to the same conclusion. *See Mot.* 24:24-5:4. CV Ice claims that FJR Pacific actually revised its recommendation to Peerless and also indicated that the weld repair was contingent on obtaining regulatory approval, but neither of those contentions are supported by the evidence. *See Opp.* 9:21-10:10, 21:20-21, 23:18-24:17; *Sullivan Decl.*, Ex. 23 (FJR Pacific's alternate proposal addressed to CV Ice); *FJR Proposal*. Accordingly, a breach of the implied covenant of good faith and fair dealing cannot be premised on Peerless' refusal to pay to replace all 12,000 feet of the block ice making system piping because Peerless' refusal to do so was reasonable as a matter of law.

However, CV Ice's second argument is that even if the isolated weld repair was all that the Policy required of Peerless, Peerless still denied coverage for certain items in an unreasonable manner that could constitute bad faith. *See Opp.* 19:27-20:13. CV Ice explains that "Peerless'[] final estimate was incomplete and inadequate because it failed to include such

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-121 PSG (SPx) | Date | January 6, 2015 |
|---|---|---|---|
| Title | CV Ice Company, Inc. v. Golden Eagle Insurance Company, *et al.* | | |

items as the emergency repairs, the cost of replacing the basket and cans that had been damaged in the accident, the cost for re-charging the anhydrous ammonia system and the cost for realigning the gantry crane. Peerless also underestimated the period of restoration by several weeks when it limited that period to only five weeks, even though CV Ice did not even receive Peerless'[] estimate until five weeks after the accident. Peerless'[] unreasonably short period of restoration failed to include the time needed to repair the system, inspect the system, and bring the system back on-line." *Id.* at 20:2-13. In its Reply, Peerless responds that CV Ice has not offered any evidence that it ever asked Peerless to pay for these items or notified Peerless of these costs or requested coverage for a period exceeding five weeks. *See Reply* 11:9-14. The argument seems to be that Peerless could not have unreasonably withheld coverage for items or processes that it did not know about. Because this defense is raised in Peerless' Reply, CV Ice has not had the opportunity to respond and present evidence demonstrating Peerless' awareness of and refusal to cover necessary additional costs. In any event, for the restoration period issue, presenting additional evidence is not necessary. Under the definition of "restoration period" applicable to Peerless' coverage position regarding the incident, the period should have extended to the "date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality[.]" *See Policy* at p.65. It was unreasonable for Peerless to set August 31, 2013 as the date when the property should be repaired with reasonable speed when it informed CV Ice of its coverage position regarding repair until after that date. *See Sullivan Decl.*, Ex. 16 (email letter indicating that Peerless informed CV Ice of its coverage position on September 5, 2013 at the earliest).

      Peerless has not yet demonstrated that it acted reasonably in setting a five-week restoration period and in not paying for the additional items highlighted by CV Ice; therefore, the Court DENIES summary judgment on the implied covenant claim, so far as it is premised on expenses attendant to the isolated weld repair.

IV.    <u>Conclusion</u>

      For the foregoing reasons, the Court GRANTS IN PART and DENIES IN PART Peerless' motion for summary judgment.

    **IT IS SO ORDERED.**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-121 PSG (SPx) | Date | January 6, 2015 |
|---|---|---|---|
| Title | CV Ice Company, Inc. v. Golden Eagle Insurance Company, *et al.* | | |